Argued and submitted October 29, 1984, convictions vacated and remanded
October 2, 1985

STATE OF OREGON,
*Respondent,*

*v.*

RICHARD ALLEN WIGGET,
*Appellant.*

(83-267CR; CA A31145 (Control))

STATE OF OREGON,
*Respondent,*

*v.*

CLEO ALLEN WIGGET,
*Appellant.*

(83-263CR; CA A31323)

STATE OF OREGON,
*Respondent,*

*v.*

RANDY LEROY WIGGET,
*Appellant.*

(83-262CR; CA A31237)

STATE OF OREGON,
*Respondent,*

*v.*

ROBERT STEVEN WIGGET,
*Appellant.*

(83-261CR; CA A31236)
(Cases Consolidated)

707 P2d 101

Helen I. Bloch, Deputy Public Defender, Salem, argued the cause for appellant Cleo Allen Wigget. With her on the brief were Gary D. Babcock, Public Defender, and Marilyn C. McManus, Deputy Public Defender, Salem.

Marilyn C. McManus, Deputy Public Defender, Salem, argued the cause for appellants Randy Leroy Wigget and Robert Steven Wigget. With her on the brief was Gary D. Babcock, Public Defender, Salem.

David E. Groom, Deputy Public Defender, Salem, argued the cause for appellant Richard Allen Wigget. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem,

argued the causes for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

WARDEN, J.

## WARDEN, J.

Defendants Cleo Wigget, Randy Wigget, Richard Wigget, and Robert Wigget, who are brothers, appeal separately from convictions arising out of their having jointly attacked and beaten a police officer who was attempting to arrest Cleo. Because the facts and issues in all of the appeals are substantially the same, we render our decisions in one opinion. We vacate each defendant's convictions and remand for entry of new judgments and resentencing.

During the night of September 20, 1983, Lake County Deputy Sheriff Lawrence Ruth encountered defendant Richard sitting on the gravel shoulder of a road near the Christmas Valley golf course. Ruth had earlier seen Richard and his brothers drinking and behaving boisterously in a restaurant. Ruth asked him if anything was wrong. Richard said that there was not, and Ruth left him there.

Further along the road Ruth saw a gray pickup truck high-centered in a field. Ruth walked up to the vehicle and found Cleo lying in the seat with his head toward the passenger side. He was awake and extremely intoxicated but claimed not to have been driving. Jessie Rust, who occasionally helped the Lake County Sheriff's Department as a backup for their deputies, arrived in his vehicle at that time.

Ruth took Cleo to the patrol vehicle, arrested him for drunk driving and handcuffed him, but Cleo refused to get into the police car. Ruth repeated his command several times, tried to push him in and, finally, struck him in the stomach with his night stick. Cleo fell to the pavement and, as Ruth attempted to force him into the patrol vehicle, the other three brothers approached from the other side of the road, screaming and throwing rocks. Ruth characterized them as drunk, angry and hostile.

Ruth transferred custody of Cleo to Rust and sprayed the other brothers with mace. The mace stopped them only briefly. Ruth drew his .357 Magnum revolver, said "Hold it" and fired once into the air. The brothers charged and, as Ruth backed away, he returned his revolver to its holster. The brothers reached him, threw him to the ground and beat him until he lost consciousness.

Rust testified that, after a first beating, the brothers

let Ruth get up but then knocked him down and beat him a second time. Rust, in the meantime, struggled with Cleo and with Randy. Cleo got away. Ruth and Rust eventually retreated, walking down the road backwards as all four Wiggets approached. Ruth told Rust that the Wiggets had his revolver. Ruth then shot Richard with a .22 caliber pistol. Rust also fired into the air, but the other brothers were not deterred. Randy demanded the keys for the handcuffs. Ruth and Rust unsuccessfully attempted to remove Cleo's handcuffs and then ran to a police vehicle parked in a motel parking lot when the brothers turned their backs. Ruth radioed for help, and Deputy Sheriff Suba arrived at the scene shortly thereafter. He found Robert and Randy carrying Richard. He instructed them at gunpoint to lie on the ground. They did so, but then all three got up and ran away. Suba did not pursue them.

Later that night, several officers discovered Richard lying wounded in a field. Randy was nearby. Randy did not submit willingly to his arrest. He fled 25 or 30 yards on foot before the officers brought him under physical control. Robert and Cleo were arrested later at a residence about a half mile away.

Ruth's injuries caused him to go into shock as he was transported to the hospital. The examining doctor testified:

"Q  O.k. Do persons ever die from shock at the level which Mr. Ruth was diagnosed?

"A  If this blood pressure was to continue for a prolonged period of time it could lead to organ impairment and death.

"Q  Long period—do you mean by? What does that mean?

"A  It's again, it varies depending on the individual, the health of the individual and so forth. A young person, a healthy person with a blood pressure of 90 could survive for several hours, two or three hours or more without having any significant impairment. On the other hand an older person with that blood pressure may suffer considerable organ impairment within 30 or 40 minutes."

The state charged Cleo with driving under the influence of intoxicants, ORS 487.540, escape in the first degree, ORS 162.165, and assault in the fourth degree. ORS 163.160.

It charged Randy with escape in the first degree, assault in the second degree, ORS 163.175, and attempted murder. ORS 163.115; 161.405. It charged both Richard and Robert with attempted murder and escape in the first degree. Defendants waived jury trial and were tried jointly. The court found all four defendants guilty of escape in the first degree. In addition, it found Cleo guilty of assault in the fourth degree, Richard guilty of assault in the second degree and Randy and Robert guilty of assault in the first degree. ORS 163.185.

Cleo assigns as error the trial court's failure to grant his motion for acquittal on the charges of escape in the first degree and assault in the fourth degree. He argues that he was too intoxicated to form the intent to commit either offense and, alternatively, that his conduct was justified (1) to avoid an imminent threat of extreme violence and potentially severe injury and (2) to defend against the allegedly excessive force that Ruth employed to get Cleo into the vehicle.

We cannot say as a matter of law that Cleo was too intoxicated to form the intent necessary to commit either crime. The effect of alcohol on mental and physical capacities may vary greatly between individuals. *See State v. Fish,* 29 Or App 15, 18-19, 562 P2d 220 (1977), *vacated in part on other grounds* 282 Or 53, 577 P2d 500 (1978). Its effect on Cleo was a question of fact. His conduct is in itself evidence from which the trial court, as trier of fact, could reasonably have concluded that he intended to do what he did. OEC 309, 311(1)(a).

For similar reasons, we reject Cleo's alternative argument that he was entitled, under Oregon's "choice of evils" statute (ORS 161.200), to commit the crimes of which he was convicted. We recognize that a citizen may resist even a lawful arrest when it is made with excessive force, *see State v. Crane,* 46 Or App 547, 552-53, 612 P2d 735, *rev den* 289 Or 903 (1980), but the trial court could have found that Ruth's striking Cleo once in the stomach with his nightstick was a reasonable method of getting him into the car.

Cleo's second assignment is that the trial court erred in failing to merge his convictions for escape in the first degree and assault in the fourth degree. We have previously held

"that the statutory scheme indicates the legislature did not

intend that a person could be separately convicted and sentenced for first [or] second degree escape based on use of force and assault when exactly the same force causes physical injury. The interest protected by the use-of-force element of escape and the assault statutes is exactly the same. The overlap between the two crimes, although not necessarily complete, is substantial * * *." *State v. Girard,* 34 Or App 85, 94, 578 P2d 415 (1978).

*See also State v. Tron,* 39 Or App 603, 592 P2d 1094 (1979); *State v. Fitzgerald,* 14 Or App 361, 513 P2d 817 (1973).

The trial court recognized that Cleo could not properly be sentenced for both the escape and the assault convictions.[1] The judgment order, however, provided "that *for sentencing* the defendant's conviction for Assault in the Fourth Degree merged into the conviction for Escape in the First Degree * * *." (Emphasis supplied.) The trial court did not vacate either of Cleo's convictions. The State argues that *State v. Girard, supra,* and *State v. Fitzgerald, supra,* require only that a defendant not be separately convicted *and sentenced* for an escape from custody and an assault on a custodian, when the assault is part and parcel of the escape.

We disagree. The Supreme Court has repeatedly tried to make clear

"that the issue of multiple sentences differs from the issue of multiple statutory violations, and that these issues are difficult to keep separate when the single word 'merger' is used to describe both. *See State v. Linthwaite, supra,* 295 Or at

---

[1] The pertinent portions of the transcript read:

"[Mr. Gitnes]: * * * Finally, I would point out that it's my understanding of the law of merger that the escape conviction should be vacated. In that it would merge with Assault in the First Degree as the same act and transaction and I believe the State's theory in this case was that the purpose of the assault was to facilitate an escape.

"The Court: I agree with that unless the D.A.'s office—.

"Mr. Nichols: That's mine—that would be my position also. There is a merger here in all four—all three cases that are (inaudible).

"The Court: And I'd already—even though I didn't state it on the record my order on Richard Wigget I did merge.

"Mr. Gitnes: O.K. The way I read *State v. Cloutier,* 286 Or 579, 596 P2d 1278, Your Honor, I'm not that well versed in it, but I believe that the proper thing to do would be to vacate even the conviction. I was not aware of that until this afternoon. But that appears to be what *State v. Cloutier* says."

The trial court expressed no disagreement with the latter statement.

174, n 11, *citing State v. Cloutier,* 286 Or 579, 586, 596 P2d 1278 (1979)." *State v. Kessler,* 297 Or 460, 462-63, 686 P2d 345 (1984).

The trial court succumbed to that confusion by "merging" the convictions for purposes of sentencing without first considering whether Cleo could validly be convicted for separate offenses. As the Supreme Court said in *State v. Kessler, supra,* 297 Or at 463,

> "It is only when a defendant has validly been convicted of separate offenses, when there is no 'merger,' that a question can arise whether the relevant laws contemplate a single sentence or cumulative sentences for such multiple offenses."

There are different standards for judging the validity of multiple convictions and of multiple sentences. In each context the Supreme Court has laid down specific rules for divining "the intentions and policies that may plausibly be attributed to the legislature * * *." *State v. Cloutier, supra,* 286 Or at 585. In the sentencing context,

> "[t]he major element in assessing whether multiple statutory violations were meant to carry cumulative punishment is whether they were committed in the course of a single criminal episode joined in time, place and circumstances and directed toward a single criminal objective." *State v. Kessler, supra,* 297 Or at 465.

In the conviction context, however, the question is whether "the completion of one offense necessarily includes commission of acts sufficient to constitute violation of another statute." *State v. Cloutier, supra,* 286 Or at 586. Although one who merely threatened to use physical force in escaping from custody might commit escape in the first degree, ORS 162.165, without also committing assault in any degree, ORS 163.160 *et seq,* that was not alleged in this case. Here, defendants were charged with *using* physical force to escape from custody, not with *threatening* to use it. As it was alleged in this case, the completion of escape in the first degree necessarily included assault in some degree. One may not be *convicted* of both escape in the first degree and assault, when the assault is part and parcel of the escape.[2]

---

[2] In *State v. Fitzgerald,* 14 Or App 361, 373, 513 P2d 817 (1973), we concluded

"that the legislature intended that defendant's conduct could be prosecuted as

Accordingly, we vacate Cleo's convictions and remand for entry of a judgment convicting him of a single offense—either escape in the first degree or assault in the fourth degree—and for resentencing.

Defendants Randy, Richard and Robert each present three identical assignments of error. One of the assignments is identical to Cleo's second assignment and is well taken for the reasons set forth above. Accordingly, we vacate all of their convictions and remand for entry of judgments convicting each of them of a single offense and for resentencing.[3] Although we vacate the convictions on that ground alone, we consider their other assignments to make clear what the trial court may do on remand.

Their first assignment is that the trial court erred in ruling that assault in the first and second degree are lesser-included offenses of attempted murder. Defendants concede that none of them preserved the error, but ask that we consider it as egregious "error apparent on the face of the record." ORAP 7.19(5). We decline to do so, in part because, in his motion for acquittal on the attempted murder charge

---

*some degree* of attempted escape and, separately, first degree assault, but did not intend that defendant's conduct could be prosecuted as both attempted *first degree* escape and first degree assault." (Emphasis in original.)

We repeated that statement in *State v. Girard, supra,* 34 Or App at 92. In *State v. Tron, supra,* 39 Or App at 605, however, we recognized that,

"[a]lthough we stated in *Girard* that we had previously held in *Fitzgerald* that a person could not be *charged* with both attempted first degree escape and first degree assault, this language was dictum since both cases actually hold that a person cannot be *convicted and sentenced* for both offenses." (Emphasis in original.)

*Tron* repudiated the *dictum* in *Fitzgerald* and *Girard* concerning the permissibility of separate charges, but added a *dictum* of its own concerning separate convictions:

"Separate convictions for both crimes are prohibited because 'the interest protected by the use-of-force element of escape and the assault statutes is exactly the same.' *State v. Girard, supra,* 34 Or App at 94." 39 Or App at 605.

We now expressly hold that the rule stated in *Tron* is correct.

[3] It is not clear from the record how the trial court could have concluded that Randy, Richard and Robert used physical force in escaping from custody; they seem not to have been escaping from custody at the time they struggled with Ruth, and the record does not indicate that they used physical force during subsequent escapes from custody. Cleo, however, was in custody at the time of the struggle with Ruth and could reasonably have been convicted of escape in the first degree. Because his brothers aided him in that crime, they may be held criminally liable for escape in the first degree under ORS 161.155.

against Robert, counsel conceded that "the State has met a burden in regards to a degree of assault, but not attempted murder." Counsel for Randy and Richard adopted the argument advanced on behalf of Robert. Defendants' motions for judgments of acquittal thus suggested to the trial court that it could consider defendants' guilt of some degree of assault.

■    Randy, Richard and Robert also argue as an alternative ground that they should be convicted of no more than assault in the fourth degree, because the state failed, they claim, to prove that Ruth suffered "serious physical injury" as those words are used in the statutory provisions defining assault in the first and second degrees. ORS 161.015(7) defines "serious physical injury" as

> "physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."

We reject the argument, because it is a question of fact whether Ruth suffered "serious physical injury" as defined above and because the trial court could reasonably have found from the fact that Ruth started to go into shock on the way to the hospital that he had suffered a substantial risk of death. That conclusion disposes as well of each defendants' second assignment of error: that the trial court erred in denying their motions for acquittal on grounds that the state failed to prove serious physical injury.

Convictions vacated and remanded for entry of judgments convicting each defendant of a single offense: Cleo of either escape in the first degree or assault in the fourth degree, Richard of either escape in the first degree or assault in the second degree and Randy and Robert of either escape in the first degree or assault in the first degree; and for resentencing.